# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re S.D.*, 2011 IL App (3d) 110184

---

| | |
|---|---|
| Appellate Court Caption | *In re* S.D., L.D. and E.T., Minors (The People of the State of Illinois, Petitioner-Appellee, v. Clarence T., Respondent-Appellant). |
| District & No. | Third District<br>Docket No. 3-11-0184 |
| Filed | August 5, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In proceedings seeking to terminate respondent's parental rights arising from the stabbing death of the biological mother of his children, the trial judge properly denied an oral motion for recusal based on his presence in the courtroom prior to the unfitness hearing while other persons were discussing evidence presented by the State in respondent's murder trial, since there was no indication the judge found respondent unfit based on anything other than his prior criminal convictions. |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, Nos. 10-JA-30, 10-JA-31, 10-JA-32, the Hon. Mark E. Gilles, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Louis P. Milot, of Peoria, for appellant.

Kevin W. Lyons, State's Attorney, of Peoria (Terry A. Mertel and Nadia L. Chaudhry, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE WRIGHT delivered the judgment of the court, with opinion.

Presiding Justice Carter and Justice Lytton concurred in the judgment and opinion.

## OPINION

¶ 1    The court found the State proved the allegations of a neglect petition alleging the minors' environment was injurious to their welfare because their biological father, appellant Clarence T., stabbed their biological "mother 30 times while in the presence of [E.T.] and a five year old girl, killing the mother," and because father had several prior criminal convictions. Subsequently, the State filed a petition to terminate father's parental rights.

¶ 2    On the morning of the unfitness hearing, the record reveals that individuals, who were not involved in the termination proceedings, were engaged in conversation in the courtroom while the judge was seated on the bench. According to the prosecutor, this conversation included a discussion of photographs of blood-splatter evidence presented by the State during father's murder trial.

¶ 3    The judge denied father's motion for recusal noting that anything the court overheard would not affect his decision and he would rely on only the evidence presented to him at the termination hearing. At the close of the termination hearing evidence, the court found father unfit. Then, following a best interest hearing, the court also found it was in the minors' best interests to terminate father's parental rights and allow the Department of Children and Family Services (DCFS) to consent to their adoption.

¶ 4    Father appeals the court's ruling denying his oral motion for recusal of the judge and the court's finding that it was in the best interests of the minors to terminate his parental rights and place the minors for adoption. We affirm.

¶ 5                    BACKGROUND

¶ 6    Respondent-appellant Clarence T. is the father of the minor children, S.D., L.D. and E.T., born October 17, 2002, June 15, 2006, and August 21, 2008, respectively. The mother of the minors, Martha T., was deceased. On February 4, 2010, the State filed a neglect petition alleging the minors' environment was injurious to their welfare because father stabbed his

estranged wife and the mother of the minors "30 times while in the presence of [E.T.] and a five year old girl, killing the mother," and that father had several criminal convictions in his history. The court entered a temporary shelter care order placing the minors with DCFS on February 5, 2010.

¶ 7     On June 29, 2010, after the adjudicatory hearing, the court found that the minors were neglected due to an injurious environment. At the dispositional hearing on August 3, 2010, the court found father dispositionally unfit to care for the minors, made the minors wards of the court, and placed them under the guardianship of DCFS. At that time, father was still incarcerated in the Peoria County jail pending trial on the murder charges involving the minors' mother's death.

¶ 8     Subsequently, on August 11, 2010, the State filed a petition for termination of parental rights on behalf of each of the minors alleging that respondent father was an unfit parent due to depravity, under section 1(D)(i) of the Adoption Act (750 ILCS 50/1(D)(i) (West 2010)), in that he had been convicted of several crimes from 1992 through 2006.[1] Specifically, the petition alleged father was convicted of the following offenses:

| "92-CR-1300301 | Aggravated Battery | Cook County |
| 93-C-22073401 | Robbery and Aggravated Battery | |
| | Of Senior Citizen | Cook County |
| 95-CF-826 | Theft (Misdemeanor) | Sangamon County |
| 98-CM-142 | Battery | Morgan County |
| 98-CR-1822101 | Aggravated Battery | Cook County |
| 03-CM-2397 | Resisting a Peace Officer | Peoria County |
| 04-CM-2717 | Retail Theft | Peoria County |
| 04-CM-2763 | Domestic Battery (2 counts) | Peoria County |
| 06-CF-364 | Violation of Order of Protection | |
| | Subsequent [O]ffenses | Tazewell County." |

¶ 9     On February 3, 2011, prior to the termination hearing, the prosecutor disclosed on the record that, as she entered the courtroom, she overheard general remarks made by other persons in the courtroom, not involved in the termination proceedings, concerning details about the photographic evidence depicting the blood-splattered murder scene which was admitted during father's separate murder trial. She stated that the judge was on the bench in the courtroom, but was not participating in this discussion. According to the prosecutor, she immediately interrupted and stopped the conversation.

¶ 10    Based on these circumstances, the State and guardian *ad litem* orally moved to have the court recuse itself from the termination hearing arguing that, although the court did nothing wrong, the court may have overheard some unsolicited details of photographic evidence that would not be presented to the court for consideration during the termination hearing. Father

---

[1]We note that S.D.'s petition to terminate parental rights listed respondent father as a "putative father" under count I, and included a count II, which listed S.D.'s father as "unknown."

joined in that motion.

¶ 11 Before ruling on the motion to recuse, the trial judge noted that he had a general knowledge that father's felony trial had been completed and was aware of the outcome of that trial. He said their circuit was a small circuit and he did not know of another judge who would not be aware of father's other case. Additionally, the judge stressed that he had not viewed any photographic evidence and was not familiar with any evidence introduced by the State during father's felony trial. The court stated that any remarks that occurred in his courtroom would have "no bearing on [his] mind and the matters that will be before [him]," and stated that he would not consider any evidence beyond what the parties introduced during the termination hearing. Consequently, the court denied the oral motion for the court to recuse itself.

¶ 12 The court then conducted the unfitness hearing regarding the State's petition for termination of parental rights. The State produced certified copies of father's convictions, as alleged in the termination petition, to prove that father was depraved as defined by the Adoption Act (750 ILCS 50/1(D)(i) (West 2010)). The court found that the State proved its case by clear and convincing evidence and found father unfit based on father's previous criminal history, which did not include the murder conviction. Following this finding, the court set the case for a "best interests" hearing.

¶ 13 The family's caseworker, Jenna Ricker, prepared a written report for the best interests hearing revealing that, on January 19, 2011, father was convicted of murdering the minors' mother and, at the time the report was prepared, father had not been sentenced. Additionally, the report included Ricker's opinion that it was in the best interests of the minors to terminate father's parental rights.

¶ 14 Ms. Ricker's report further provided that the minors had initially been placed together in temporary foster care at the home of their godmother until August 2010, when father objected to that placement based upon the godmother's extensive criminal history. The court agreed with father and ordered that the minors be placed in a more suitable foster home. At that time, S.D. was placed in a separate foster home, where he continued to reside. The two younger minors were placed in a temporary foster home for two days until finding a more permanent foster home, where they remained in placement, together, at the time of the unfitness hearing. According to the report, the minors had adjusted well to their current foster homes, which provided the minors with a safe and healthy environment, and all three minors had strong bonds with their foster parents. Additionally, their current foster parents were willing to adopt the minors if father's rights were terminated. The report stated that the minors had not seen their father since the stabbing on January 19, 2010, nor did they have a bond with their father.

¶ 15 On February 16, 2011, the court held the best interests hearing and admitted Ricker's written report. During the best interests hearing, father testified that he disagreed with the report. Father stated that he had a close bond with the minors and that it was not in their best interests to terminate his parental rights. He explained that, when he resided with the minors and their mother, he saw the minors consistently on a daily basis. Father said the minors show their affection for him by hugging and kissing him. Father stated that he played games

with the minors, read books to them, and attended school events with the oldest child. He said he also cooked for the minors, washed their clothing, and made sure they were properly bathed and dressed. Father testified that he disciplined the minors by giving them "timeouts" if they did not obey him. Father stated that he wanted the minors placed with family members rather than in a foster home.

¶ 16     Father then read a prepared statement to the court. Father said that he married the minors' mother in 2005 and they remained a family until October 9, 2009, when father and mother separated. They had been living in Miami, Florida, for a while. In October 2009, mother was diagnosed with schizophrenia and bipolar disorder and, according to father, mother's attitude toward father changed. Father testified that mother started threatening father and used his criminal history and her own mental illness to manipulate the court system to get father in trouble.

¶ 17     Father stated that he was tried and convicted by the court system before his murder case actually went to trial. He shared similar concerns that the outcome of the juvenile proceeding was affected by statements made in the courtroom before his unfitness hearing began and when the juvenile judge was present. Father said he was wrongfully determined to be a depraved parent based on some outdated paperwork.[2] Father stated he was innocent of first degree murder and, because of the current proceedings, if the court terminates his rights, the minors will have lost two parents instead of one, as well as all of their other family members. Father asked the court not to terminate his parental rights and to place the minors with his family members in Chicago.

¶ 18     Father testified that he, mother, and the minors all lived together in Miami from February 29, 2009, through fall of 2009. After mother's death, father said the minors were originally placed with the minors' godmother, Karen, in the instant case and father did not agree with that placement because she had several criminal felony convictions.

¶ 19     At the close of the evidence and arguments at the best interests hearing, the court found that it was in the best interests of all three minors to terminate father's parental rights, as well as any possible unknown father of S.D. The court then awarded DCFS the guardianship of the minors with the power to consent to adoption. Father filed a timely appeal.

¶ 20                                ANALYSIS

¶ 21     On appeal, father claims that the trial court erred in denying the oral motion for recusal on February 3, 2011. Additionally, father argues that it was not in the best interests of the minors to terminate his parental rights. The State contends that the trial judge did not abuse his discretion when deciding not to recuse himself from the juvenile case and, further, that the court's finding that it was in the best interests of the minors to terminate father's parental rights was not against the manifest weight of the evidence.

---

[2]Father does not challenge this finding on appeal.

¶ 22                                I. Recusal By the Court

¶ 23     Supreme Court Rule 63(C)(1)(a) imposes an ethical obligation on every judge to disqualify himself or herself in a proceeding when the court's impartiality may be in question. Ill. S. Ct. R. 63(C) (eff. Apr. 16, 2007). The rule provides:

> "(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:
>
>> (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding." Ill. S. Ct. R. 63(C) (eff. Apr. 16, 2007).

¶ 24     The record reveals that father joined the prosecutor's and the guardian *ad litem*'s motion for the court to recuse itself due the serious nature of termination of parental rights proceedings. We review a trial judge's recusal decision using an abuse of discretion standard of review. *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163, 175 (2008); *People v. Kliner*, 185 Ill. 2d 81, 169 (1998).

¶ 25     Neither an oral nor a written motion to recuse is required to trigger a judge's personal obligation to consider recusal as required by the Code of Judicial Conduct (Ill. S. Ct. R. 63(A) (eff. Apr. 16, 2007)). Although attorneys may make the court aware of certain factors that could potentially require the trial judge to contemplate recusal, a party cannot compel a judge to step aside by "moving" for recusal.

¶ 26     If the parties are not satisfied with the court's ruling on an informal request for recusal, the parties may then file a motion for substitution under section 2-1001(a)(3) of the Code of Civil Procedure with the required affidavits in order to compel substitution in certain situations. 735 ILCS 5/2-1001(a)(3) (West 2010); *In re D.F.*, 201 Ill. 2d 476, 506 (2002). Here, the parties did not file a written motion for substitution following the court's decision to deny the request to recuse; thus, the considerations applicable to a ruling on written motion to substitute are not applicable to the analysis in this case.

¶ 27     In the case at bar, the prosecutor stressed that, although the judge was on the bench during the conversation concerning father's murder trial, the judge was not participating in this discussion that occurred off the record. After the parties brought this circumstance to the court's attention, the trial judge carefully considered the concerns as raised by the parties. The judge assured both sides that the discussion between other individuals in his courtroom would have "no bearing on [his] mind and the matters that will be before [him]." Consequently, the court elected to conduct the hearing as scheduled.

¶ 28     The case law establishes that a trial judge is presumed to be impartial. *Eychaner v. Gross*, 202 Ill. 2d 228, 280 (2002); *In re Marriage of Hartian*, 222 Ill. App. 3d 566, 569 (1991). The case law also provides that a judge, when he is the trier of fact, is presumed to have considered only admissible evidence before reaching a decision. *People v. Naylor*, 229 Ill. 2d 584, 603 (2008).

¶ 29     On appeal, father does not challenge the court's finding of unfitness as improper or state how the conversation, if overheard, affected the outcome of the best interests hearing. Instead, father summarily contends the court should have recused itself based on the judicial

-6-

canons.

¶ 30 After carefully reviewing this record, we conclude there is no indication that the judge determined father was unfit based on any information other than the certified copies of father's previous criminal convictions offered for the court's consideration. Based on this record, we conclude that the trial judge did not abuse his discretion by denying the oral motion to recuse himself from the proceedings.

¶ 31                                II. Best Interests Hearing

¶ 32 Proceeding on a petition for termination of parental rights involves a two-step, bifurcated approach where the court first holds an "unfitness hearing" (705 ILCS 405/2-29 (West 2010); 750 ILCS 50/1(D) (West 2010)) and, if the parent is found unfit, conducts a subsequent "best interests hearing" (705 ILCS 405/2-29(2) (West 2010)). *In re D.T.*, 212 Ill. 2d 347, 352-53 (2004). In the instant case, father does not challenge the court's finding of unfitness at the termination hearing. Instead, father contends that the court erroneously found that it was in the best interests of the minors to terminate his parental rights and allow DCFS to place the minors for adoption.

¶ 33 After a finding of unfitness, the State must prove by a preponderance of the evidence that it is in the child's best interests to terminate the parental rights. *D.T.*, 212 Ill. 2d at 365. When reviewing a trial court's best interests determination, this court applies the manifest weight of the evidence standard of review. *In re R.L.*, 352 Ill. App. 3d 985, 1001 (2004); *In re B.B.*, 386 Ill. App. 3d 686, 697 (2008). A trial court's decision is against the manifest weight of the evidence if the facts clearly demonstrate that the court should have reached the opposite result. *In re D.F.,* 201 Ill. 2d at 498; *B.B.*, 386 Ill. App. 3d at 697-98.

¶ 34 During the best interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest to live in a stable, permanent, loving home. *D.T.*, 212 Ill. 2d at 364. When determining the best interests of a child for purposes of a termination petition, the court is required to consider a number of statutory factors "in the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2010). These statutory factors include: (a) the physical safety and welfare of the child, including food, shelter, health, and clothing; (b) the development of the child's identity; (c) the child's background and ties, including familial, cultural, and religious; (d) the child's sense of attachments including (i) where the child actually feels love, attachment, and a sense of being valued; (ii) the child's sense of security; (iii) the child's sense of familiarity; (iv) continuity of affection for the child; and (v) the least disruptive placement alternative for the child; (e) the child's wishes and long-term goals; (f) the child's community ties, including church, school, and friends; (g) the child's need for permanence, which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives; (h) the uniqueness of every family and child; (i) the risks attendant to entering and being in substitute care; and (j) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2010); *B.B.*, 386 Ill. App. 3d at 698-99.

¶ 35 In the case at bar, the evidence showed that father's unfitness finding of depravity was based upon several earlier convictions charging violent acts. Father does not challenge this

depravity finding, and many of these convictions show father's propensity for violence relative to the minors' safety and sense of security, which are factors in determining the minors' bests interests. In addition, prior to the best interests hearing, father had also been convicted of the first degree murder charge which alleged that father killed the minors' mother by stabbing her several times in the presence of E.T. and others.

¶ 36    By the time the court held the best interests hearing on February 3, 2011, the minors had not seen father since their mother died on January 19, 2010. In spite of father's testimony that he had a close bond with his children, the best interests report stated that the minors did not mention their father or have a bond with him. Instead, the report verified that all three minors had adjusted well to their current foster care placements and had strong bonds with their foster parents, and that the foster parents were willing to provide safe, healthy, and permanent homes for the minors if they were released for adoption.

¶ 37    Based on this information, the trial judge found that the State had established, by a preponderance of the evidence, that it was in the best interests of the minors to terminate father's parental rights. After our careful review of the record, in light of the factors to be considered during a best interests hearing, we conclude the trial court's finding regarding the children's best interests was not against the manifest weight of the evidence.

¶ 38                                    CONCLUSION

¶ 39    For the foregoing reasons, we affirm the decision of the trial court terminating father's parental rights.

¶ 40    Affirmed.