**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 200047-U

Order filed June 11, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| *In re* D.S., | ) | Appeal from the Circuit Court |
| | ) | of the 9th Judicial Circuit, |
| a Minor | ) | Knox County, Illinois, |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | Appeal No. 3-20-0047 |
| Petitioner-Appellee, | ) | Circuit No. 18-JA-6 |
| | ) | |
| v. | ) | |
| | ) | |
| D.S., II, | ) | Honorable |
| | ) | Raymond A. Cavanaugh, |
| Respondent-Appellant). | ) | Judge, Presiding. |

_____

JUSTICE WRIGHT delivered the judgment of the court.
Justices Carter and Holdridge concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  The trial court properly denied father's request for a continuance of the best interests hearing, found father was an "unfit person," and terminated father's parental rights. Father did not receive ineffective assistance of counsel.

¶ 2    D.S. was removed from the custody of her mother, Michelle Greene (mother), and declared a ward of the court. Mother relinquished her parental rights and consented to the adoption of D.S. by her foster parents. Petitioner, the People of the State of Illinois (State), filed

a petition to terminate the parental rights of respondent, D.S., II (father). The trial court found father was an "unfit person," then terminated his parental rights. Father appeals.

¶ 3                                    I. BACKGROUND

¶ 4          D.S. was born on August 28, 2003. On January 16, 2018, the State filed a petition for wardship, alleging D.S. was a neglected minor due to an "environment *** injurious to *** her welfare" under section 2-3(1)(b) of the Juvenile Court Act of 1987, 705 ILCS 405/2-3(1)(b) (West 2016). The allegations contained in the petition for wardship focused on the methamphetamine related conduct and convictions of mother and her live-in boyfriend. Father did not reside in the household during the relevant time frame.

¶ 5          Following a shelter care hearing conducted on January 16, 2018, the trial court found probable cause for neglect and removed D.S. from mother's care. D.S. was placed in the temporary custody of the Illinois Department of Children and Family Services (Department). The trial court appointed an agency, Court Appointed Special Advocates (CASA) of Knox County, to act as guardian *ad litem* for D.S.

¶ 6          On May 1, 2018, mother and father were present in the trial court for an adjudicatory hearing. Following the hearing, the trial court entered an order finding D.S. was neglected under section 2-3(1)(b) of the Juvenile Court Act of 1987 due to her exposure to "mother's drugs."

¶ 7          On May 22, 2018, the Department filed a dispositional report and integrated assessment in the trial court. The integrated assessment indicated father had "not made himself available to the monitoring agency since case opening [in January 2018] and his whereabouts were unknown at the time." However, the Department noted D.S. "does not want to return to her father's care due to severe corporal punishment and inadequate supervision." The Department also noted allegations of father's "past drug use and domestic violence." The Department recommended

2

that the trial court not allow visitation between father and D.S. until father met "with the permanency worker," "engage[d] in services to address assessed concerns," and "demonstrate[d] [a] commitment to having a relationship with" D.S.

¶ 8    On June 19, 2018, the trial court held a dispositional hearing. Neither mother nor father were in attendance. Following the dispositional hearing, the trial court entered a written order finding it was in the best interests of D.S. to be declared a ward of the court. Mother was found to be unfit to care for D.S. due to "continued drug use and lack of cooperation." Father was found to be unwilling to care for D.S. due to a "lack of cooperation and failure to appear" at the dispositional hearing. The trial court ordered D.S. to remain in the custody of the Department.

¶ 9    Moreover, the trial court's written order, dated June 19, 2018, admonished mother and father that they must cooperate with the Department, comply with the service plan, and correct the conditions requiring D.S. to be in the care of the Department. Otherwise, "they risk[ed] termination of their parental rights." Father was also ordered to "complete a substance abuse evaluation and follow all recommendations including twice monthly random drug drops."

¶ 10    On November 9, 2018, the CASA guardian *ad litem* for D.S., Melena Medley, submitted a letter to the trial court, stating D.S.'s foster mother reported D.S. "expressed wanting to be adopted by [her foster mother] and w[ould] run away if removed *** to be placed with her father." Eight months later, the CASA guardian *ad litem*, Janice Nelson, filed a letter stating D.S. "made it clear that she is not interested in seeing either her biological mother or father."

¶ 11    On March 5, 2019, mother voluntarily relinquished her parental rights and consented to the adoption of D.S. by her foster parents. On July 8, 2019, the State filed a petition to terminate father's parental rights under section 2-13 of the Juvenile Court Act of 1987, 705 ILCS 405/2-13 (West 2018), alleging father was an "unfit person" under section 2-29 of that statute, 705 ILCS

3

405/2-29 (West 2018), and section 1(D)(m) of the Adoption Act, 750 ILCS 50/1(D)(m) (West 2018). Father allegedly failed "to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent" and failed "to make reasonable progress toward the return of the child to the parent" "during any 9-month period (January 2018 – present) following the adjudication of neglected *** under Section 2-3" of the Juvenile Court Act of 1987.[1] The State requested that the Department be appointed guardian with the power to consent to adoption.

¶ 12     On November 4, 2019, the Department submitted to the trial court a report on the best interests of D.S. The Department's report, in part, stated:

> Father "did not participate in the initial Integrated Assessment and has not been compliant with [the Department] since case opening. [Father] has not completed any of his Service Plan goals since case opening, including a substance abuse evaluation, parenting classes, and general compliance with [the Department] ***. [Father] lives with his parents in Georgia and did not provide accurate contact information to this worker until 07/09/2019."

The Department's report also stated D.S. "does not wish to live with her father and *** needs to stay in this adoptive home [of her foster parents] that continues to provide her structure, nurturing, stability, and her half-siblings." For these reasons, the Department recommended that the parental rights of father be terminated, the Department be appointed guardian with the right to consent to adoption, and the permanency goal for D.S. be changed to adoption.

---

[1]The State also made allegations under section 1(D)(b) of the Adoption Act. See 750 ILCS 50/1(D)(b) (West 2018). These allegations were subsequently rejected by the trial court.

¶ 13    The trial court held a hearing with respect to father's parental fitness on November 5, 2019. The first witness to testify was the Department's caseworker, Drake Griffith. Griffith stated father had "not made any progress towards his service-plan goals or the return-home goal." Father never participated in an integrated assessment, a substance abuse evaluation, or parenting classes. Father did not demonstrate to the caseworker that he could provide suitable housing or obtain a sufficient income to support D.S. This lack of progress occurred "during the nine-month period from January of 2018 through the present."

¶ 14    Griffith testified that father attempted to contact him "a maximum of five times" since January 2019. When Griffith spoke by phone with father, father asked "what he would need to do in order to not lose his rights," which caused Griffith to discuss the necessity of completing a substance abuse evaluation and parenting classes. Griffith testified that following these inquiries and discussions, father failed to initiate or complete any actions required by the service plan.

¶ 15    Next, the Department's public service administrator, Missy Speth, testified before the trial court. Speth explained that she supervised this case for the Department between January 2018, when the case was opened, and June 2019. Speth stated father "was out of state for the duration of this case" and failed to provide the Department with his current contact information.

¶ 16    Moreover, Speth did not recall father attending—either by phone or in person—any of the Department's monthly child and family team meetings. Similarly, father did not cooperate with the Department, show he could obtain suitable housing and income, or participate in a substance abuse evaluation or parenting education, as required by the service plan.

¶ 17    The trial court also heard testimony from D.S.'s foster mother, Lisa Bramlett. On one occasion, Bramlett said she telephoned father so he could participate in the Department's child and family team meeting. Father "stayed on the line for the entire *** meeting."

5

¶ 18    Father also testified at the fitness hearing. Father stated in January 2018, when D.S. was removed from her mother's home and placed into the custody of the Department, he was residing in East Moline, Illinois. In February 2018, father moved to Georgia to "start fresh" and secure a better income. After D.S.'s removal from mother's home, father contacted the Department, "but they already had put her in the temporary custody because they couldn't contact" father.

¶ 19    Further, father said he "never received the service plan" from the Department. Although he called the Department "many times" trying to set up an integrated assessment, father was never able to do so. Prior to January 2019, father could not consistently reach his assigned caseworker. Thereafter, when Griffith became the caseworker in January 2019, father attempted to contact the Department 10-15 times, resulting in three conversations. During these conversations, father agreed he and Griffith "talk[ed] about the case" and "the action plan." Father also admitted that, at the last court hearing, Griffith gave him "a little pink sticky note *** [that] said parenting classes *** [and] substance abuse."

¶ 20    Consistent with Bramlett's testimony, father testified that he had one "phone call with the child and family team meeting." During the call, father "let [the team members] know that if [he] do[es] not know the dates that *** all this stuff's happening, *** it's hard." This is because father works as a traveling mechanic. Father stated he was present in court on at least six occasions between January 30, 2018, and September 17, 2019, but he did not go to the Department to address concerns about his inability to reach his caseworker.

¶ 21    At the close of the fitness hearing, the trial court made the following findings under section 1(D)(m) of the Adoption Act:

> "I do find that the State's met their burden by clear and convincing
>
> evidence because [father] has done nothing to make reasonable efforts to correct

6

the conditions that were the basis of the removal and for reunification in a nine-month period. He hasn't done anything in the client service plan in the 18 months except maintain some phone contact and show up for court, and I don't find that sufficient to correct the conditions that led to the removal of [D.S.] from *** her mother's care.

And that he hasn't done the parenting classes. He hasn't done the substance abuse assessment as ordered. He hasn't done any treatment that's recommended after that, and that's pretty clear that he's basically maintained minimal contact ***. [H]e is not following the client service plan or the integrated assessment, which he did not take part in."

The trial court entered an order finding father was an "unfit person" under section 1(D)(m)(i) and (ii) of the Adoption Act for failing to make reasonable efforts or progress in this case.

¶ 22    On November 22, 2019, the guardian *ad litem* for D.S., Nelson on behalf of CASA, filed a letter in the trial court. Nelson said she again asked D.S. "if she had changed her mind with regards to her dad's parental rights." D.S. answered "no." When asked what D.S. liked about living with her foster parents, D.S. responded "electricity." According to Nelson, D.S. explained "the power has never been turned off *** since she's been there and there is heat and water." D.S. added that there is also "food in the refrigerator." Although D.S. acknowledged father traveled a lot for work, D.S. indicated "many times when she was alone without the basics, she heard [father] was in town from friends." D.S. again told Nelson she "can't go back to that."

¶ 23    The trial court held a best interests hearing on November 26, 2019. Prior to the best interests hearing, father's counsel verbally requested a continuance due to father's absence. Counsel stated, "I don't know why [father] is not here but he was informed last court date that

7

the next court date was supposed to be today." The trial court denied the request for a continuance because the matter was set "in open court" and all necessary parties were present "without advance notice of a written motion to continue."

¶ 24 Thereafter, the Department's caseworker, Griffith, testified that D.S. was "doing very well" and "thriving" with her foster parents. D.S. was bonded with her foster parents and able to spend time with her half siblings. D.S. was also doing well in school and being provided "all indicia of support." D.S. wanted to stay "with the current foster family and continue growing and moving forward with them." Griffith believed "it would drastically disrupt [D.S.'s] life if she were to be moved or relocated."

¶ 25 Next, D.S. testified at the best interests hearing. D.S. said she has never felt physically unsafe while living with her foster parents. However, there were times when she felt physically unsafe while living with her father. D.S. elaborated by stating, "I've gone without power and water. I have also been left at home by myself on multiple occasions." Further, on one occasion, father disciplined D.S. with a smack in the face. As a result, D.S. testified that she was "scared of being *** alone with" her father because "[h]e just kind of scares" her.

¶ 26 D.S. described living with her foster parents by stating:

"[T]here's more stability in my life now that I'm there. I don't have to worry about anything getting turned off or going without a house *** [and] I just feel like they're there for me even emotionally *** . My dad would walk away laughing if I asked him to talk to me or he'd always have something else to do but there I feel like I just have a safe place to live and people that care about me and want me there."

8

¶ 27　　　　　Although D.S. enjoyed spending time and would like a relationship with father, she did not want to go through "any more emotional pain." When asked what additional efforts her father could have displayed, D.S. responded "I would have liked him to try to do the [Department's] service plan. He did none of that. I would have liked to see a little more initiative." Ultimately, D.S. stated she hoped to be adopted by her foster parents.

¶ 28　　　　　Following D.S.'s testimony, the trial court found it was in the best interests of D.S. for father's parental rights to be terminated. The trial court reasoned "for years [D.S.] did not feel *** she mattered to [father] and *** that was perpetuated through the course of the last several years when he refused to do his service plan and had excuses of why not to do anything." The trial court entered a written order terminating father's parental rights and ordering the Department to remain as the guardian of D.S. with the right to consent to adoption.

¶ 29　　　　　On December 19, 2019, father filed a motion to reconsider. On January 17, 2020, the Department submitted a permanency hearing report and service plan to the trial court. The Department's report contained the statement that "[t]here has not been any reasonable efforts or progress [by father]." Contact between the Department and father remained minimal and father had not engaged in any services. The guardian *ad litem*, Nelson acting on behalf of CASA, and the Department agreed on a recommendation of adoption.

¶ 30　　　　　On January 21, 2020, following a continuance to ensure father's ability to be present in court, the trial court conducted a hearing on the motion to reconsider. Father was present and provided testimony to the trial court. The trial court then denied the motion to reconsider. Father filed a timely notice of appeal on January 30, 2020.

¶ 31                                    II. ANALYSIS

¶ 32        On appeal, the following issues are presented for review: (1) whether the trial court erred by denying father's counsel's verbal request for a continuance of the best interests hearing; (2) whether the trial court erred by finding father was an "unfit person" or by terminating father's parental rights after a best interests hearing; and (3) whether father received ineffective assistance of counsel. We address each issue separately below.

¶ 33                       A. Request for a Continuance of the Best Interests Hearing

¶ 34        Initially, father argues his due process rights were violated when the trial court denied his counsel's verbal request for a continuance and held the best interests hearing in his absence. Father claims the trial court's decision barred him "from presenting any evidence or having a meaningful voice in the second stage" of the termination of his parental rights. Father "did not willfully fail to appear," but his car was repossessed and he could not afford an airline ticket.

¶ 35        Under the Juvenile Court Act of 1987, a party does not "have an absolute right to a continuance." *In re S.W.*, 2015 IL App (3d) 140981, ¶ 31; See also *In re M.R.*, 393 Ill. App. 3d 609, 619 (2009). Delays "impose a grave cost to the lives of the children involved." *In re S.W.*, 2015 IL App (3d) 140981, ¶ 37. Therefore, the decision to deny such a continuance is left within the discretion of the trial court. *Id.* ¶ 31. We will not reverse that decision unless there has been a "manifest abuse or palpable injustice" and prejudice to the complaining party. *Id.* ¶¶ 31, 35.

¶ 36        Further, a parent is not automatically deprived of due process when the best interests hearing is held in his or her absence. See *id.* ¶ 34. A parent has a right to be present during termination proceedings, but his or her presence "is not mandatory" and the trial court "is not required to wait until the parent chooses to appear." See *id.*

¶ 37   We believe this is particularly true where, as was the case here, father was present in court on the date the best interests hearing was scheduled, father failed to explain his inability to attend the best interests hearing in advance, father's absence could not be explained to the trial court by counsel at the time of the requested continuance, and father was represented by counsel during the best interests hearing. See *In re S.W.*, 2015 IL App (3d) 140981, ¶¶ 34, 43; *In re M.R.*, 393 Ill. App. 3d at 619; *In re Tashika F.*, 333 Ill. App. 3d 165, 169 (2002); *In re C.L.T.*, 302 Ill. App. 3d 770, 779 (1999) (due process was not denied, where, among other things, the mother "was represented by counsel at the [termination] hearing."). Moreover, we note that the trial court continued the hearing on father's motion to reconsider to ensure father could be personally present in the trial court to provide testimony at that time.

¶ 38   Under these circumstances, we conclude the trial court was within its discretion to commence the best interests hearing and did not deny father due process.

¶ 39                                  B. Termination of Parental Rights

¶ 40   Next, father challenges the trial court's finding that he was an "unfit person" who, after the best interests hearing, should have his parental rights terminated. Father's challenge is two-fold and requires our court to examine the evidence presented at both the fitness hearing and the best interests hearing. Our court will not reverse the trial court's findings on father's fitness or D.S.'s best interests unless they are against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001); *In re S.D.*, 2011 IL App (3d) 110184, ¶ 33.

¶ 41   In this case, the State filed its petition to terminate father's parental rights under section 2-13 of the Juvenile Court Act of 1987, which states: any "agency or association by its representative may file, or the court on its own motion, consistent with the health, safety and best interests of the minor may direct the filing through the State's Attorney of a petition in respect of

11

a minor." 705 ILCS 405/2-13(1) (West 2018). The petition "may request the termination of parental rights and appointment of a guardian *** with power to consent to adoption of the minor under Section 2-29 at any time after the entry of a dispositional order under Section 2-22." See *id*. § 2-13(4). This was the procedural posture of the present case. Therefore, in its petition to terminate parental rights, the State invoked section 2-29 of the Juvenile Court Act of 1987, which states:

> "[T]he court *** after finding, based upon clear and convincing evidence, that a parent is an unfit person as defined in Section 1 of the Adoption Act, may terminate parental rights and empower the guardian *** of the minor *** to appear in court where any proceedings for the adoption of the minor may at any time be pending and to consent to the adoption." See *id*. § 2-29(2) (West 2018).

¶ 42                                   1. Fitness

¶ 43        Consistent with section 2-29(2) of the Juvenile Court Act of 1987, the State alleged father was an "unfit person" under section 1(D)(m) of the Adoption Act for failing to make reasonable efforts or progress between January 2018 and July 8, 2019. Section 1(D)(m) is a ground for unfitness if:

> "[A] parent [fails] (i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected *** under Section 2-3 of the Juvenile Court Act of 1987 ***, or (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected *** under Section 2-3 of the Juvenile Court Act of 1987." 750 ILCS 50/1(D)(m) (West 2018).

¶ 44 By way of review, the trial court found father was an "unfit person" under both section 1(D)(m)(i) and (ii) of the Juvenile Court Act of 1987. On appeal, father argues the trial court's finding under section 1(D)(m)(i) was erroneous because "the reason for removal did not even involve [him], [so] there were no conditions for him to correct." The State agrees with father and concedes this point, but argues father was properly found to be an "unfit person" under section 1(D)(m)(ii). Father argues the trial court's finding that he was an "unfit person" under section 1(D)(m)(ii) was against the manifest weight of the evidence.

¶ 45 Under section 1(D)(m)(ii), "reasonable progress" is an objective standard requiring, "at a minimum, the parent [to] make measurable steps toward the goal of reunification through compliance with court directives, service plans or both." *In re S.H.*, 2014 IL App (3d) 140500, ¶ 30. The "benchmark" for the parent encompasses "compliance with the service plan and the court's directives in light of the conditions causing removal, as well as other conditions that would prevent the court from returning the minor to her parent's custody." *In re J.H.*, 2014 IL App (3d) 140185, ¶ 22; See also *In re C.N.*, 196 Ill. 2d at 216-17. Reasonable progress exists if the trial court can conclude the progress made by the parent to comply with directives for the return of the minor is "sufficiently demonstrable and of such a quality" that the trial court can order the minor returned to the parent "in the near future." *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17. The failure of a parent to make "reasonable progress" toward the return of the minor includes the failure to "substantially fulfill" his or her obligations under the service plan and to correct the conditions that brought the child into care. *Id.*; 750 ILCS 50/1(D)(m)(ii) (West 2018).

¶ 46 Initially, father claimed he never received the service plan. However, on June 19, 2018, the trial court entered an order admonishing father that he must cooperate with the Department and comply with the service plan. By all accounts, father failed to do so. Father was not present

in court on that date, but he was represented by counsel. As D.S.'s parent, father had a "duty to follow the progress of his case." See *In re K.O.*, 336 Ill. App. 3d 98, 106 (2002).

¶ 47    At the fitness hearing, the Department's caseworker, Griffith, and case supervisor, Speth, testified that father never cooperated with the Department, demonstrated he could obtain suitable housing and sufficient income, or participated in an integrated assessment, a substance abuse evaluation, or parenting classes, as required by his service plan. This testimony by Griffith and Speth supported the trial court's finding that father did nothing to comply with the "service plan in the 18 months except maintain some phone contact and show up for court." Moreover, as an aside, we note the record is replete with evidence that D.S. preferred to remain with her foster family and did not wish to return to her father's care. This is important because "[i]f the minor is over 14 years of age, the court may, in its discretion, consider the wishes of the minor in determining whether the best interests of the minor would be promoted *by the finding of the unfitness of a non-consenting parent*." 705 ILCS 405/2-29(2) (West 2018) (Emphasis added.)

¶ 48    Under these circumstances, it was not against the manifest weight of the evidence to find father was an "unfit person" who failed "to make reasonable progress toward the return of" D.S. "during any 9-month period" after she was adjudicated neglected. See 750 ILCS 50/1(D)(m)(ii) (West 2018); *In re S.H.*, 2014 IL App (3d) 140500, ¶ 30; *In re J.H.*, 2014 IL App (3d) 140185, ¶ 22; *In re C.N.*, 196 Ill. 2d at 208, 216-17; *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17.

¶ 49                                2. Best Interests

¶ 50    Next, we consider whether the trial court erred by finding it was in the best interests of D.S. for father's parental rights to be terminated. Section 1-3(4.05) of the Juvenile Court Act of 1987 requires consideration of the following factors, among others, when determining best interests:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

* * *

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

***

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives." 705 ILCS 405/1-3(4.05)(a), (d), (e), (g) (West 2018).

¶ 51     At the best interests hearing, Griffith testified that D.S. was "doing very well" and "thriving" with her foster parents, who provided D.S. with "all indicia of support." See *id*. § 1-3(4.05)(a), (d), (g) (West 2018). D.S. was able to spend time with her half siblings and wanted to stay with her foster parents. See *id*. § 1-3(4.05)(e), (g). Griffith believed "it would drastically disrupt [D.S.'s] life if she were to be moved or relocated." See *id*. § 1-3(4.05)(d), (g).

¶ 52     Significantly, D.S. presented testimony at the best interests hearing. D.S. testified that she was "without power and water" and "left at home by [herself]" while living with father, but she

15

never similarly felt physically unsafe or unprovided for by her foster parents. See *id*. § 1-3(4.05)(a). D.S. had "more stability" in her life, more emotional support, and "a safe place to live [with] people that care[d]." See *id*. § 1-3(4.05)(a), (d), (g). Although D.S. enjoyed spending time and would like a relationship with father, she did not want "any more emotional pain." See *id*. D.S. hoped to be adopted by her foster parents. See *id*. § 1-3(4.05)(e).

¶ 53    Based on this record, it was not against the manifest weight of the evidence for the trial court to find it was in D.S.'s best interests for father's parental rights to be terminated, which paved the way for her adoption by the Bramletts. See *In re S.D.*, 2011 IL App (3d) 110184, ¶ 33.

¶ 54                             C. Ineffective Assistance of Counsel

¶ 55    Finally, father argues he received ineffective assistance of counsel. To prevail on this claim, father must establish: (1) counsel's performance fell below an objective standard of reasonableness; and, (2) counsel's deficient performance was so prejudicial that, but for counsel's errors, the outcome likely would have been different. *In re A.J.*, 323 Ill. App. 3d 607, 611 (2001). If we can dispose of father's claim on the basis of insufficient prejudice, then we need not determine whether counsel's performance was deficient. *Id*.

¶ 56    Here, father has not demonstrated that he was prejudiced by counsel's representation. See *id*. The trial court found father was an "unfit person" under section 1(D)(m)(ii) of the Adoption Act because he failed to comply with the terms of his service plan by participating in an integrated assessment, parenting classes, and a substance abuse assessment. See 750 ILCS 50/1(D)(m)(ii) (West 2018). No degree of effective advocacy could change these material facts, which were determinative of the unfitness finding. See *id*.

¶ 57    Similarly, father has not sufficiently indicated additional witnesses or other evidence would have rebutted the opinions contained in the Department and guardian *ad litem's* reports or

16

expressed by the witnesses, including D.S., at the best interests hearing. By all accounts, D.S.'s interests were best served in the care of her foster family, where she wished to remain. See 705 ILCS 405/2-29(2) (West 2018); 705 ILCS 405/1-3(4.05)(e) (West 2018).

¶ 58    For these reasons, we reject the contention that father's counsel committed errors that prejudiced the outcome of the trial court proceedings.

¶ 59                    III. CONCLUSION

¶ 60    The judgment of the circuit court of Knox County is affirmed.

¶ 61    Affirmed.