# Illinois Official Reports

## Appellate Court

---

### *In re C.D.*, 2020 IL App (3d) 190176

---

| | |
|---|---|
| Appellate Court Caption | *In re* C.D., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Jaymi J., Respondent-Appellant). |
| District & No. | Third District<br>No. 3-19-0176 |
| Rule 23 order filed<br>Rehearing denied<br>Motion to publish allowed<br>Opinion filed | February 14, 2020<br>February 14, 2020<br><br>March 3, 2020<br>March 3, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Henry County, No. 18-JA-21; the Hon. Terence M. Patton, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Matthew Paulson, of Paulson and Vandersnick, of Rock Island, for appellant.<br><br>Matthew Schutte, State's Attorney, of Cambridge (Patrick Delfino, Thomas D. Arado, and Richard T. Leonard, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

JUSTICE McDADE delivered the judgment of the court, with opinion. Presiding Justice Lytton and Justice Holdridge concurred in the judgment and opinion.

**OPINION**

¶ 1     The State filed a petition for adjudication of wardship and a petition for temporary custody against respondent Jaymi J., alleging that her son, C.D., was living in an environment injurious to his welfare because of multiple incidents involving alcohol consumption and domestic violence. The trial court granted both motions. At the dispositional hearing, the court ordered that C.D. be placed in substitute care pending termination of parental rights and granted the Department of Children and Family Services (DCFS) guardianship with the right to place. Subsequently, the court found Jaymi to be an unfit parent on the grounds of failure to maintain a reasonable degree of interest, concern, or responsibility as to C.D.'s welfare and habitual drunkenness or addiction to drugs. The court ultimately determined that it was in the best interest of C.D. to terminate Jaymi's parental rights. Jaymi appealed, challenging the trial court's unfitness and best interest findings.

¶ 2     We issued an order affirming the trial court's decision. Thereafter, Jaymi filed a petition for rehearing, which reiterated her challenge to the sufficiency of the evidence, asserting that the trial court failed to take judicial notice of prior evidence of habitual drunkenness and, therefore, that the evidence was not properly before the court. We address that renewed challenge here, modify our decision upon denial of rehearing, and publish the order as an opinion.

¶ 3                              I. BACKGROUND

¶ 4     On July 29, 2017, respondent, Jaymi J., gave birth to a son, C.D. Eight days after his birth, C.D. was removed from the home and placed in foster care pursuant to allegations that he was living in an injurious environment. In May 2018, under circumstances that are not clear from our record, C.D. was returned by the Bethany for Children and Families agency representative, Brittany Bulman, to Jaymi's custody. On May 9, 2018, the State filed an initial petition for adjudication of wardship. After hearing evidence in support of the petition that day, the trial court found that the State had not met its evidentiary burden and denied the petition. On May 15, 2018, the State filed a second petition for adjudication of wardship and a motion for temporary custody. Following an evidentiary hearing held the same day, the petition was filed, the motion was granted, and C.D. was returned to the foster home where he continues to live.

¶ 5     In its second petition for adjudication of wardship, filed May 15, 2018, the State alleged that C.D., born July 29, 2017, was living in an environment injurious to his welfare because C.D.'s mother, Jaymi, has been abusing alcohol. She tested positive for alcohol following visits with C.D. on November 8, 2017, December 15, 2017, and April 16, 2018; she tested positive for opiates following visits on November 8, 2017, and November 20, 2017; and she failed to appear for alcohol and/or drug testing on February 5, 2018, February 12, 2018, May 1, 2018, and May 8, 2018. The State also alleged that the Henry County Sheriff's Department had responded to 26 incidents involving Jaymi and C.D.'s putative father, James D., between January 2017 and May 2018. Some of the incidents involved alcohol consumption by either or

both, and some of the incidents involved allegations of domestic violence. Jaymi stated to the police and others that James was also her own biological father. The State also filed a motion for temporary custody, stating that C.D. was taken into protective custody on May 14, 2018, and that removal of C.D. from his home was necessary for his protection.

¶ 6     On the same day, a hearing on both the petition and the motion for temporary custody was held. The trial court expressed concern about the petition because it had previously denied the State's May 9 petition for adjudication of wardship that contained factual allegations similar to those in the May 15 petition. The court allowed the State to present its evidence to sustain its claim that the petition contained new allegations. Before the State presented its case, it requested that Jaymi submit to a breath test because two probation employees had just spoken with her and smelled alcohol on her breath. The State also stated that DCFS asked Jaymi to take a breath test on May 14, but she refused. The court ordered that Jaymi take a breath test, and the test revealed a 0.068 blood alcohol concentration (BAC). After the court asked Jaymi several questions, it determined that she was not disoriented and that her test result was not so high as to cause concern about her participation in the hearing. After the hearing, the court allowed the petition to be filed and granted the motion for temporary custody. C.D. was again removed from Jaymi's custody. Subsequently, James surrendered his parental rights.

¶ 7     In July 2018, the State amended its petition for adjudication of wardship for the sole purpose of correcting the spelling of the minor's given name. A hearing on the amended petition was held in October 2018. Jaymi did not attend the hearing but was present by counsel. Before the hearing began, Jaymi's attorney told the court that his assistant had advised him that Jaymi was not coming to court that day and that she wished to relinquish her parental rights. However, her attorney had not spoken with her personally to verify the information.

¶ 8     The parties presented multiple witnesses. Robert VanSeveren testified for the State that he was a child abuse investigator at DCFS. He became involved in this case because the state hotline received a report on May 11, 2018, that there were concerns regarding Jaymi's "ongoing alcohol abuse issues as well as some alleged domestic violence that was in the home." He elaborated that Jaymi posted a picture on Facebook, depicting a broken crib, and wrote a message, stating " 'This is James *** work or what he does, how he takes care of his child.' " During VanSeveren's investigation, he tried to locate Jaymi at her residence in Lynn Center, Illinois, "a couple times" with no success. Although VanSeveren did not locate Jaymi, his coworker had contact with Jaymi and James on May 13, assessed the residence, and believed "everything was OK that evening." The next day, VanSeveren received several reports from the sheriff's department about domestic disturbances involving Jaymi and James. The police had contact with Jaymi and James at least three times between May 11 and 13. Thereafter, VanSeveren took C.D. into temporary custody. Since May 13, VanSeveren had received 14 police reports involving calls of domestic disturbances or requests for emergency assistance and 7 of those 14 reports stated that Jaymi and James were intoxicated or highly intoxicated. VanSeveren also reviewed previous investigation reports involving Jaymi and found that she had 23 police contacts. In his file, VanSeveren had 36 different police reports involving Jaymi, beginning around the time Jaymi was pregnant with C.D. On occasion during her pregnancy, officers had observed her intoxicated.

¶ 9     On cross-examination, VanSeveren explained that when his coworkers had contacted Jaymi and James on May 13, they observed that neither parent appeared to be under the influence and concluded that C.D. was safe. When he took custody of C.D., Jaymi did not

appear to be intoxicated but, based on the police contacts over the preceding weekend, his office directed him to take C.D. into protective custody. Before Jaymi could visit C.D., she was required to take a breath test. She tested positive for alcohol on November 13, 2017, December 19, 2017, and April 18, 2018. She tested positive for opiates on November 13, 2017, and November 20, 2017. In addition, DNA testing of Jaymi, James, and C.D. showed that James was the biological father of both Jaymi and C.D.

¶ 10    Henry County Sheriff's Department deputy Jon Hornback testified that he had responded to numerous incidents involving James and Jaymi. On May 12, 2018, Hornback was dispatched to the Lynn Center residence for a domestic incident. When he arrived, Jaymi and James appeared to be under the influence of alcohol. He observed empty beer cans and a bottle of vodka inside and outside the residence. His most recent call to the residence occurred on August 4. During his visit, he believed James and Jaymi appeared "highly intoxicated." He never saw C.D. during his visits.

¶ 11    Geneseo Police Department officer George Marquez recalled that he responded to between four and seven domestic violence or alcohol-related incidents involving Jaymi and James. In particular, in May 2017, he responded to a domestic incident between the two when Jaymi was six months pregnant. When he arrived, Jaymi was "on the floor with a bottle of vodka in her hand and a cigarette in her mouth, complaining about James." She had trouble getting up from the floor and continued to drink from the bottle of vodka while she talked to Marquez.

¶ 12    Henry County Sheriff's Department officer Dave Davis testified that, in early July 2018, he had contact with Jaymi and James because Jaymi alleged that James raped her. When he arrived at the scene, Jaymi "seemed extremely intoxicated," and Davis could "smell alcoholic-type beverage on her breath from many feet away." He also observed her "staggering, slurring, [and] making incoherent statements." During his employment with the sheriff's department, Davis had visited the Lynn Center residence 7 to 10 times.

¶ 13    Henry County Sheriff's Department deputy Joseph Tellier testified that he had contact with Jaymi and James "ten or more times throughout my career." These contacts involved alcohol and domestic incidents. In August, he arrested Jaymi for striking James with a beer mug. Henry County Sheriff's Department deputy Brian Haars also testified that he had multiple contacts with Jaymi and James. His most recent visit to the Lynn Center residence involved an allegation of arson against Jaymi. Jaymi and James appeared to be intoxicated during the incident.

¶ 14    Brittany Bulman testified that she was employed by Bethany for Children and Families and had worked with Jaymi and James. Since July 2017, Jaymi's cooperation level had been poor. Although Bulman reported numerous attempts to contact Jaymi, she had been unable to communicate with her. Jaymi had also not visited C.D. since June 11, 2018. The court found that C.D. was in an injurious environment, adjudicated him neglected, and ordered a dispositional report.

¶ 15    On October 30, 2018, Bulman filed the dispositional hearing report. The report stated that the Bethany agency had recommended that Jaymi attend visits with C.D., participate in individual counseling for sexual abuse and domestic violence, obtain a substance abuse evaluation and comply with random urine analysis, obtain and maintain a legal source of income, and obtain and maintain appropriate housing. The report further stated that Jaymi was unsatisfactory in completing the recommendations and requested that the permanency goal be return of C.D. to the home within 12 months. The report also detailed Jaymi's substance use,

stating that she had continued "to drink alcohol in excess." Jaymi had a 0.148 BAC on May 12, 2018, and a 0.191 BAC on May 13, 2018. Jaymi admitted that she had consumed "4 shots of vodka per day" and had been a daily drinker because it was "something to do." A source stated that Jaymi's "drinking habit has increased and that she seems to drink vodka when sad or depressed."

¶ 16     On November 14, 2018, a dispositional hearing was held. Again, Jaymi did not attend the hearing. The attorney for DCFS sought the court's adoption of the recommendations but urged acceleration to termination, if legally allowed, because the child had actually been in foster care for an extended period prior to the current problems. C.D.'s guardian *ad litem* urged proceeding to termination expeditiously because further delay undermined the permanency needed by this child. Following a sidebar for review of the statute, the court adopted the recommendations in the dispositional hearing report, changed the permanency goal, ordered that C.D. be placed in substitute care pending termination of parental rights, and granted DCFS guardianship with the right to place.

¶ 17     On December 26, 2018, the State filed a supplemental motion to terminate parental rights, alleging that Jaymi was unfit on one or more of four grounds: (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to C.D.'s welfare under section 1D(b) of the Adoption Act (750 ILCS 50/1D(b) (West 2016)); (2) failure to protect C.D. from conditions within his environment injurious to his welfare under section 1D(g) of the Adoption Act (*id.* § 1D(g)); (3) open and notorious adultery or fornication under section 1D(j) of the Adoption Act (*id.* § 1D(j)); and (4) habitual drunkenness or addiction to drugs under section 1D(k) of the Adoption Act (*id.* § 1D(k)).

¶ 18     On February 27, 2019, the unfitness hearing was held. Bulman testified that the Bethany agency executed a service plan for Jaymi after it received temporary custody of C.D. and that Jaymi's level of progress was unsatisfactory because she had had no contact with the agency since June 2018. The plan recommended that Jaymi complete a mental health assessment and a substance abuse assessment, but Bulman did not know if Jaymi had started or completed either of them. During the time the agency had temporary custody, Jaymi had not been visiting C.D. on a regular basis. She had missed all of her scheduled weekly visitations with C.D. since June 2018. Bulman attempted to communicate with Jaymi by calling her, texting her, and mailing her the results of the DNA testing, but she never responded. Bulman believed the agency implemented the service plan in late June or early July of 2018. Jaymi's visitation was terminated in July 2018 because she failed to attend. Bulman had no information about Jaymi's housing, employment, or income. The agency's contact information had remained the same throughout the pendency of this case.

¶ 19     Jaymi testified that, since May 2018, she had attempted to call Bulman six times. She talked with Bulman by phone in June 2018, and she texted Bulman in July 2018 about C.D.'s birthday. She sent Bulman between 20 and 30 text messages between May 2018 and December 2018, requesting visitation and asking, "how my son was doing," but Bulman never replied. Jaymi also called the Bethany agency on one occasion, but the secretary informed her that Bulman was out of the office. Jaymi said there was a point in time when Bulman's cell phone number changed and "[a]s soon as she changed her number, I changed it in my phone."

¶ 20     The court questioned Bulman, and she stated that she had received a new phone from the agency sometime in June or July 2018. She sent about three text messages to Jaymi from the new phone but Jaymi never responded. Bulman stated that Jaymi would have been aware of

her assessment requirements because she had mailed the service plan to her. She never personally talked to Jaymi about the plan, although she made text and mail attempts to do so. Jaymi's failure to address completion of her service recommendations continued after the dispositional hearing on November 14, 2018, to December 11, 2018.

¶ 21 Bulman did not testify about Jaymi's alcohol or drug use during the unfitness hearing, nor did the State ask the court to take judicial notice of the October 30 disciplinary report or of prior evidence concerning her alleged substance abuse. The court also did not give notice to the parties of any intention to *sua sponte* take prior substance abuse evidence into consideration in reaching its decision.

¶ 22 The court ruled that Jaymi was an unfit parent, finding that she failed to maintain a reasonable degree of interest, concern, or responsibility for C.D.'s welfare because she had not visited C.D. since June 2018, had not been to court since July 2018, and had not completed any services recommended by DCFS. The court noted that Jaymi's attorney had received a message that Jaymi wished to surrender her parental rights. The court also determined that there was evidence of habitual drunkenness or addiction to drugs because "[t]he evidence on that is lengthy, including as I said before, the first time she showed up in court here, she had a BAC that was just barely under .08, the legal limit for driving." The court held that the State failed to prove by clear and convincing evidence that Jaymi participated in open and notorious adultery and fornication but did find that she failed to protect C.D. from the conditions within his environment that were injurious to his welfare.

¶ 23 On March 27, 2019, the best interest hearing was held. Rachel McCoy testified that she was C.D.'s foster mother. She was married and worked for Moline Public Schools. She had been C.D.'s caretaker since he was eight days old. At the time of the hearing, C.D. was one and a half years old. Rachel had two other children, an eight-year-old and a nine-year-old, both of whom got along "very well" with C.D. At their home, C.D. had his own room. She takes C.D. to the doctor and dentist and meets all his needs. She stated that she loved C.D. and he seemed to love her. She planned to adopt C.D.

¶ 24 On direct examination, Jaymi testified that she was living at the Lynn Center residence but was willing to move to another residence in Rock Island, Illinois. She had a room and toddler bed for C.D. at the Rock Island residence, and she was willing to take care of him. Jaymi stated that "[t]here is nothing I wouldn't do for my child. *** He is mine. He is my baby, and I will do anything and everything I can to take care of him, and that's what I've done before." On cross-examination, Jaymi stated that she was cleaning houses about 20 hours a week and made $18 an hour. In seeming contradiction to her prior statement, Jaymi stated that she was living at the Rock Island residence of her boyfriend. The court inquired about Jaymi's slurred speech and asked her if she had been drinking or taking medication. Jaymi responded that she had not been drinking but she had taken a prescribed Vicodin pill for her injured leg two hours earlier. The trial court found that it was in C.D.'s best interest to terminate Jaymi's parental rights. Jaymi appealed.

¶ 25 II. ANALYSIS

¶ 26 A. Parental Fitness

¶ 27 Jaymi first argues that the trial court's finding of unfitness was against the manifest weight of the evidence. Specifically, she alleges that the State failed to show habitual drunkenness or addiction to drugs because the only evidence actually presented at the hearing was her BAC

results from her first court appearance, which is not enough to prove habitual drunkenness. Jaymi also claims that the State failed to prove that she did not maintain a reasonable degree of interest, concern, or responsibility for C.D.'s welfare because (1) there is no evidence about when she was ordered to comply with her service plan, (2) she attempted to call Bulman numerous times, and (3) the trial court improperly relied on Jaymi's privileged statement to her attorney and her missed court dates in its determination.

¶ 28    The State concedes that it did not prove its claim of habitual drunkenness or addiction. However, the State contends that it did prove by clear and convincing evidence that Jaymi failed to maintain a reasonable degree of interest, concern, or responsibility for C.D.'s welfare because the evidence shows that Jaymi failed to have any contact with Bulman or with C.D. for seven months and she did not comply with her service plan.

¶ 29    As to the State's first allegation, section 1D(k) states that a parent may be found unfit if there is evidence of "[h]abitual drunkenness or addiction to drugs, other than those prescribed by a physician, for at least one year immediately prior to the commencement of the unfitness proceeding." 750 ILCS 50/1D(k) (West 2016). Habitual drunkenness is proven when the evidence shows that the individual (1) had a fixed habit of drinking to excess and (2) used alcohol so frequently that the individual could not control the need or craving for it. *In re Precious W.*, 333 Ill. App. 3d 893, 899 (2002). "[E]vidence of indulgence without intermission is not necessary to prove [an] addiction." *Id.* "It is sufficient to show that a person has demonstrated an inability to control his or her habitual craving." *Id.*

¶ 30    The parties agree that the State failed to prove habitual drunkenness or addiction to drugs because the State did not present any evidence at the unfitness hearing regarding Jaymi's habitual drinking or drug use and did not ask the court to take judicial notice of any of the ample evidence of Jaymi's drinking in this record. In our original decision in this appeal, we considered matters that were prominent in the record but had not been presented at the unfitness hearing held on February 27, 2019, and affirmed the trial court's ruling regarding Jaymi's habitual drunkenness. Our decision was rendered in a situation where two rules of appellate review were at odds with one another. On the one hand, we can affirm the trial court's decision if the evidence in the record supported the judgment, regardless of the allegation or the reason given by the trial court for its decision. *In re Grotti*, 86 Ill. App. 3d 522, 531 (1980). However, the trial court's decision as to whether a parent is unfit should be based only upon evidence properly admitted at the unfitness hearing. *In re A.B.*, 308 Ill. App. 3d 227, 239 (1999). Therefore,

> "[w]holesale judicial notice of all matters occurring prior to the unfitness hearing is unnecessary and inappropriate, and a trial court should only take judicial notice of those portions of the underlying court files that had been proffered by the State and to which the respondent is given an opportunity to object." *In re J.P.*, 316 Ill. App. 3d 652, 663 (2000).

When, as in this case, the trial court effectively "notices" matters not introduced at the unfitness hearing, even though within the court's personal knowledge of the case, error has occurred. We compound that error with our own when we affirm the trial court's decision on the basis of the same unsubmitted and unvetted "evidence." Here, the case for habitual drunkenness was not proven in the trial court and cannot be sustained in this court.

¶ 31    We could remand for new fitness and best interest hearings, limiting the trial court to consider only "the evidence presented to it and properly admitted." *Id.* We need not do so

when, as in this case, the State has satisfied its burden on other grounds. *In re A.B.*, 308 Ill. App. 3d at 239 (affirming where respondent suffered no prejudice because "other evidence was sufficient to establish at least one ground of parental unfitness by clear and convincing evidence").

¶ 32    The State is not required to prove every ground it has alleged for finding a parent unfit. *In re K.I.*, 2016 IL App (3d) 160010, ¶ 37 (citing *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005)). "A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *In re Gwynne P.*, 215 Ill. 2d at 349. "However, we must review the facts of each termination-of-parental-rights case with close scrutiny." *In re A.B.*, 308 Ill. App. 3d at 240. We find, as did the trial court, that the evidence presented at the hearing supports another of the State's allegations, that Jaymi failed to maintain a reasonable degree of interest or concern *vis-à-vis* her parent-child relationship with C.D.

¶ 33    Section 1(D)(b) states that a parent's failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare is a ground for finding the parent unfit. 750 ILCS 50/1(D)(b) (West 2016). Since the language is in the disjunctive, any of these three elements may be considered on its own as a basis for unfitness: the failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare. *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004). "[A] trial court must focus on a parent's reasonable efforts and not her success, and must consider any circumstances that may have made it difficult for her to visit, communicate with or otherwise show interest in her child." *Id.* If personal visits with the child are somehow impractical, other methods of communication, such as letters, telephone calls, and gifts can demonstrate a reasonable degree of interest, concern, or responsibility depending on the content, tone, and frequency of those contacts under the circumstances. *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 35. A parent is not fit merely because she has demonstrated some interest in or affection toward her child; rather, her interest, concern, and responsibility must be reasonable. *Jaron Z.*, 348 Ill. App. 3d at 259. We will not reverse a trial court's finding of unfitness unless it is contrary to the manifest weight of the evidence. *In re K.I.*, 2016 IL App (3d) 160010, ¶ 38 (citing *In re Gwynne P.*, 215 Ill. 2d at 354). A determination is against the manifest weight of the evidence when the opposite conclusion is clearly evident. *Id.*

¶ 34    At the unfitness hearing, Bulman testified that Jaymi's level of progress was unsatisfactory because she had had no contact with the Bethany agency since June 2018. As a result, there was no evidence that she had begun or completed any of her assigned tasks. She had also missed all of her scheduled weekly visitations with C.D. since June 2018. Bulman attempted to communicate with Jaymi by calling and texting her, and by mailing her the DNA results, but she never responded. Jaymi testified that she had tried to call Bulman six times since May 2018. She stated that she talked with Bulman by phone in June 2018 and sent her 20 to 30 text messages between May 2018 and December 2018, requesting information regarding her visitation rights and on C.D.'s welfare. On examination by the trial court, Bulman confirmed that she received a new phone from the agency but stated that she sent three texts to Jaymi from her new phone and Jaymi never responded.

¶ 35    A trial court's determination of parental unfitness involves factual findings and credibility assessments that the court is in the best position to make. *In re A.B.*, 308 Ill. App. 3d at 240. We therefore defer to the court's disposition, particularly where evidence is in conflict. *Id.* We withhold our deference only where the court's determination is against the manifest weight of

the evidence. *In re K.I.*, 2016 IL App (3d) 160010, ¶ 38 (citing *In re Gwynne P.*, 215 Ill. 2d at 354).

¶ 36   We conclude that even if Jaymi could not contact Bulman on her cell phone, she certainly had numerous opportunities to communicate with her at the agency. But Jaymi's testimony indicates that, during the seven months, she called the agency only once. Moreover, we do not find any discrepancy between Jaymi's and Bulman's accounts of what happened when Bulman's cell phone number changed. Jaymi testified that she was aware of the change in phone number and had updated Bulman's new contact information in her phone. Without considering any of the evidence that was not admitted at trial, we find that the State's allegations regarding Jaymi's lack of interest, concern, and responsibility were supported by clear and convincing evidence properly admitted at the February 27, 2019, fitness hearing. We therefore affirm the trial court's ruling of unfitness.

¶ 37                                    B. Best Interest

¶ 38   Next, Jaymi argues that the trial court's finding to terminate her parental rights was against the manifest weight of the evidence. She claims that the evidence showed that she is C.D.'s biological mother, she loves C.D., and she is capable of providing a stable and loving environment for C.D. at her new residence in Rock Island, Illinois. Jaymi also alleges that she was not given an opportunity to show she could provide, love, and care for C.D.

¶ 39   The State contends that the trial court's ruling was not against the manifest weight of the evidence because the evidence showed that the foster family and C.D. had a loving and supportive relationship and Bulman believed it was in the best interest of C.D. to remain in his current foster home. The State claims that, although Jaymi testified that she loved C.D. and could provide him with a loving and stable home, there was no evidence to show that it would be in C.D.'s best interest to be returned to her custody and care.

¶ 40   After a finding of unfitness, the State must prove by a preponderance of the evidence that it is in the child's best interest to terminate the parental rights. *In re S.D.*, 2011 IL App (3d) 110184, ¶ 33. During the best interest hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest to live in a stable, permanent, loving home. *Id.* ¶ 34. When determining the best interest of a child for purposes of a termination petition, the court is required to consider a number of statutory factors " 'in the context of the child's age and developmental needs.' " *Id.* (quoting 705 ILCS 405/1-3(4.05) (West 2010)). These statutory factors include (a) the physical safety and welfare of the child, including food, shelter, health, and clothing; (b) the development of the child's identity; (c) the child's background and ties, including familial, cultural, and religious; (d) the child's sense of attachments, including (i) where the child actually feels love, attachment, and a sense of being valued, (ii) the child's sense of security, (iii) the child's sense of familiarity, (iv) continuity of affection for the child, and (v) the least disruptive placement alternative for the child; (e) the child's wishes and long-term goals; (f) the child's community ties, including church, school, and friends; (g) the child's need for permanence, which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives; (h) the uniqueness of every family and child; (i) the risks attendant to entering and being in substitute care; and (j) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2016). A trial court's termination ruling will not be reversed unless it is against the manifest weight of the evidence. *In re S.D.*, 2011 IL App (3d) 110184, ¶ 33.

¶ 41      The evidence shows that, except for a few days, C.D. has been with his foster parents since he was eight days old, a period of about one and one-half years at the time of the hearing. The entirety of the formative period has been spent within the foster family. His foster parents provide for C.D.'s safety and welfare. He gets along well with his foster siblings and seems to love his foster mother; the foster mother loves C.D. and wishes to adopt him. Although Jaymi testified that she loved C.D., she failed to make reasonable efforts to visit with him and nurture the parent-child bonds. She also maintained she could provide for him, but we believe the evidence shows that, at this time, Jaymi cannot provide a stable and permanent home for C.D. There is no evidence that Jaymi has consistently sought treatment and counseling for her issues or that she has developed tools for recognizing or acting in either her own best interest or that of C.D. For these reasons, we determine that the trial court did not err in finding that it was in the best interest of C.D. to terminate Jaymi's parental rights.

¶ 42                               III. CONCLUSION

¶ 43      The judgment of the circuit court of Henry County is affirmed.

¶ 44      Affirmed.