NOTICE
Decision filed 08/31/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 220229-U

NOS. 5-22-0229, 5-22-0230, 5-22-0231 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* T.D., T.B., and Ti.D., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County. |
| | ) | |
| Petitioner-Appellee, | ) | No. 19-JA-149 |
| | ) | No. 19-JA-150 |
| v. | ) | No. 19-JA-166 |
| | ) | |
| Tony D., | ) | Honorable |
| | ) | Thomas E. Little, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Presiding Justice Boie and Justice Cates concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The trial court's findings that respondent-father was an unfit person to parent the minors and it was in the best interests of the minors that respondent-father's parental rights be terminated are affirmed, where the findings were not against the manifest weight of the evidence.

¶ 2     Respondent, Tony D. (Father), appeals the trial court's orders terminating his parental rights to T.D., T.B., and Ti.D., claiming the trial court's findings of unfitness and best interests were in error. For the following reasons, we affirm the trial court's decision.

1

¶ 3                                    I. BACKGROUND

¶ 4     T.D. was born July 26, 2007, T.B. was born August 30, 2009, and Ti.D. was born May 21, 2019. Tony D. is the children's biological father. The child's biological mother, Latasha B. (Mother), is not a party to this appeal and will only be discussed as necessary to provide clarity.

¶ 5     On May 23, 2019, the State filed petitions for adjudication of wardship alleging T.D. and T.B. were neglected because they were minors who were not receiving the proper or necessary care for their well-being and their environment was injurious to their welfare. The petitions further alleged that T.D. and T.B. were abused due to being minors whose parent created "a substantial risk of physical injury to such minors other than by accidental means which would be likely to cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function." At the shelter care hearing held the same day, the trial court found probable cause existed for the filing of the petitions, that it was an immediate and urgent necessity that T.D. and T.B. be removed from the home, and that leaving them in the home was contrary to their health, welfare, and safety. The court placed T.D. and T.B. in the temporary custody of the Illinois Department of Children and Family Services (DCFS) and ordered supervised visitation with the parents.

¶ 6     On June 4, 2019, the State filed a petition for adjudication of wardship alleging Ti.D. was neglected because he was a minor whose environment was injurious to his welfare, and his blood, urine, or meconium contained any amount of a controlled substance. The petition further alleged Ti.D. was abused due to being a minor whose parent created "a substantial risk of physical injury to such minor other than by accidental means which would be likely to cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function." At the shelter care hearing held the same day, the trial court found probable cause existed for the filing

2

of the petition, that it was an immediate and urgent necessity Ti.D. be removed from the home and leaving him in the home was contrary to Ti.D.' s health, welfare, and safety. The court placed Ti.D. in the temporary custody of DCFS and ordered supervised visitation with the parents at the agency's discretion.

¶ 7 On July 5, 2019, the agency, Webster-Cantrell Youth Advocacy (an agency which contracts with DCFS to assist with the implementation of service plans for families), filed a service plan. Pursuant to the plan, Father's tasks were to: (1) call within 24 hours to cancel any appointments with the agency and service providers; (2) keep all appointments with the agency and to meet with the agency whether the meetings were scheduled or unscheduled; (3) sign releases; (4) keep the agency informed of any changes in address, telephone number, employment, or household composition; (5) obtain a domestic violence assessment and follow all recommendations; (6) obtain a substance abuse assessment and follow all recommendations; (7) submit to random drug screens; (8) obtain a parenting assessment and follow all recommendations; and (9) obtain a mental health assessment and complete any recommended counseling.

¶ 8 On July 15, 2019, the trial court entered, by stipulation of Father and Mother, adjudicatory orders finding T.D. and T.B. abused or neglected in that they suffered from a lack of support, education, or remedial care. On September 30, 2019, the trial court entered, by stipulation of Father and Mother, an adjudicatory order finding Ti.D. abused or neglected in that he was (1) in an environment that was injurious to his welfare, (2) a newborn exposed to illicit drugs, and (3) in substantial risk of physical abuse.

¶ 9 On July 15, 2019, the trial court entered, by stipulation of Father and Mother, dispositional orders finding the parents unfit and unable to care for T.D. and T.B., granting custody and

guardianship of T.D. and T.B. to DCFS, and ordering supervised visitation with the parents. On September 30, 2019, the trial court entered, by stipulation of Father and Mother, a dispositional order finding the parents unfit and unable to care for Ti.D., granting custody and guardianship of Ti.D. to DCFS, and ordering supervised visitation with the parents.

¶ 10    The permanency review report filed by the agency in each of the children's cases on December 31, 2019, indicated there had been no contact from Father since the temporary custody hearings on May 23, 2019, and June 4, 2019. The permanency review report filed in each of the children's cases on June 22, 2020, indicated that Father's address was unknown, the agency was unable to acquire it after a diligent search, and Father remained out of contact with the agency. Similar findings were made in the October 16, 2020, permanency review report filed in each of the children's cases. The permanency review report filed in each of the children's cases filed on April 15, 2021, indicated that Father: (1) failed to appear for drug screens; (2) failed to engage in parenting classes; (3) completed inpatient drug treatment but failed to engage in outpatient services; (4) had not engaged in visitation with the children although attempts to schedule visitation were made by the agency; (5) participated in a telephonic meeting with the caseworker and her supervisor on October 21, 2020; and (6) reviewed the most recent service plan with the caseworker and her supervisor. The permanency review reports filed in each of the children's cases on September 30, 2021, October 22, 2021, and March 4, 2022, all indicated that Father made no effort or progress in the cases.

¶ 11    On October 26, 2021, the State filed petitions in all three cases seeking a finding of unfitness and termination of Father's parental rights. The petitions alleged Father was unfit due to his: (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare; (2) failure to make reasonable efforts towards correcting the conditions that

4

were the basis for the removal of the children from the parent during any nine-month period following adjudication; and (3) failure to make reasonable progress toward the return of the children to the parent during any nine-month period following adjudication. The nine-month periods for making reasonable progress were: (a) from July 18, 2019, to April 18, 2020; (b) from April 18, 2020, to January 18, 2021; and (c) from January 18, 2021, to October 18, 2021.

¶ 12    The trial court conducted the fitness portion of the termination hearing on February 24, 2022. The State called Jennifer Cooper, a foster care supervisor with Webster-Cantrell Youth Advocacy. Ms. Cooper was the caseworker for the family from December 2019 until October 2021. She testified the children were initially brought into DCFS care due to domestic violence and substance abuse issues. She further addressed Father's initial service plan which consisted of cooperation with the agency, domestic violence services, substance abuse counseling, parenting classes, mental health services and counseling as well as the October 2020 amendment that excluded counseling as a separate service from mental health services and the June 2021 amendment that added incarcerated parent planning.

¶ 13    Ms. Cooper testified that Father completed a 30-day inpatient substance abuse program, but did not engage in follow-up treatment, and, thus, did not successfully complete substance abuse services. At the October 2020 telephonic family meeting with Father, Ms. Cooper and her supervisor advised Father of the need for him to complete substance abuse follow-up services. Her last contact with Father occurred at this telephonic meeting in October 2020. In June 2021, Father wrote a letter to the agency requesting that family members be allowed to care for the children. Throughout the life of the case, Father failed to complete any of his services in his service plans. Ms. Cooper had not received any proof of engagement or completion of domestic violence or mental health services. Ms. Cooper stated that if Father were immediately released from

incarceration and completed services, there was a possibility that the children could return home. However, based on her experience of working with Father in the past, Ms. Cooper believed it was unlikely this would occur. She opined the children could not be returned to Father in the near future. Following Ms. Cooper's testimony, the State rested.

¶ 14    The defense called Father to testify, who stated he was currently incarcerated in the Illinois Department of Corrections (IDOC) but anticipated being released in late January or early February 2023. He did not know where he would live upon release. He confirmed that he was not incarcerated at the outset of the case in May 2019 but was incarcerated from September 2019 until March 2020. He further confirmed that he was not incarcerated from March 2020 through May 2021 and was free to engage in services during that time. He stated his current incarceration stemmed from a felony conviction in May 2021.

¶ 15    Father stated he did not engage in parenting classes before his initial incarceration because he could not pay the fee. He completed inpatient substance abuse treatment but did not participate in follow-up services. Although he was given the option of either participating in outpatient treatment or moving on to "the next step," he could not move on to "the next step" due to his background. He agreed that Ms. Cooper advised him in October 2020 that he needed to complete services. During his incarceration, he completed the "Inside Out Dad's Program," but still had "a long ways to go." He was participating in substance abuse services in IDOC but had not yet completed them. During the life of the case, Father did not ask to be involved with conferences with the agency. He was, however, willing to complete whatever services were needed upon his release from IDOC to get his children returned to him. No further evidence was presented.

¶ 16    At the conclusion of the evidence and after hearing closing arguments, the trial court found the State proved by clear and convincing evidence that Father was unfit to parent the children due

6

to his failure to: (1) maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare; (2) make reasonable efforts to correct the conditions that were the basis for the removal of the children from him during any nine-month period following adjudication of neglect and/or abuse and/or dependency under the Juvenile Court Act of 1987 (Juvenile Court Act); and (3) make reasonable progress toward the return of the children to him during any nine-month period following the adjudication of neglect and/or abuse and/or dependency under the Juvenile Court Act with the time periods being from July 18, 2019, to April 18, 2020; April 18, 2020, to January 18, 2021; and January 18, 2021, to October 18, 2021.

¶ 17    The trial court conducted the best interest portion of the termination hearing on March 31, 2022. The State called Ms. Cooper. She testified that according to agency reports, the children were happy and doing well in their foster homes. The youngest child, Ti.D., was in a long-term placement in a traditional foster home with the foster parent intending to adopt him. Ti.D. had a strong bond with the foster parent and her extended family. He also had a large group of children and family day care providers with whom he interacted. He knew no other place as home.

¶ 18    Ms. Cooper testified that the other two children, T.D. and T.B., were placed together in a short-term placement. However, long-term placement with family members in Ohio was being pursued. T.D. and T.B. had friends in their school and community. During the life of the case, T.D. had been moved four times in foster placement. The children's current placements provided and met all of their needs. Ms. Cooper recommended that Father's parental rights be terminated and the children be freed for adoption.

¶ 19    The State next called Nerissa Jones, who became the current caseworker for the family in October 2021. Ms. Jones stated that T.D. had some behavior issues which made it difficult for him to remain in his last placement, so he was returned to his previous foster home where T.B. was

still placed. She testified the agency was exploring out-of-state kin as placements for T.D. and T.B. Ms. Jones visited with the children recently and found them all to be doing well in their placements. While Ti.D. was in a long-term placement, T.D. and T.B. were not. Ms. Jones stated the agency was unable to move forward with the process of placing T.D. and T.B. in Ohio in a long-term relative placement until the goal in the case was changed to adoption. Neither Father nor the guardian *ad litem* presented any evidence.

¶ 20    At the close of the evidence and after hearing arguments of counsel, the trial court stated it considered the best interest factors set forth in section 1-3 of the Juvenile Court Act (705 ILCS 405/1-3 (West 2020)) and proceeded to articulate its findings regarding the children and the factors. The court stated:

"With respect to [Ti.D.], the youngest child, who's almost three years old, I believe the most important factors that are applicable to this case would be what I oftentimes see in termination hearings. In other words, the child, this child's sense of attachment, where this child feels a sense of security, a sense of continuity, a sense of familiarity, and the least disruptive placement for the child, as well as the child's need for permanency."

¶ 21    The trial court continued:

"With respect to the two older children [T.D.] and [T.B.] the analysis is a little bit different in my view. There have been placement disruptions, most especially with [T.D.]. I believe the evidence was that he's now in his fourth placement *** so it's *** difficult. There's not a whole lot of evidence here in terms of development of close relationships with either the parents or the foster care *** parents. *** I think the most important factor, from the statute, which I'm considering with respect to

8

the two older children, would *** be the fundamental need for these children having a permanent placement, *** some place where they [have] a sense of stability and where they can hopefully develop a continuity of relationships."

¶ 22 The trial court found the testimony of both Ms. Cooper and Ms. Jones credible. It first addressed Ms. Cooper's testimony. The children were all doing okay in their placements. Ti.D. was in a long-term placement and had a big group of children and extended family with whom he had developed relationships, and T.D. and T.B. had friends at school. The current placements met all three of the children's needs, and the children were happy, safe, and cared for well in their placements. Her recommendation was that Father's parental rights be terminated and the children freed for adoption. The trial court next addressed Ms. Jones's testimony. The children were all doing okay in their placements. Ti.D.'s placement was likely a permanent and long-term placement, and there was the possibility of placing T.D. and T.B. with family members in Ohio for the long term. Her belief, based on her opinion regarding the length of the case and DCFS directives in finding permanent placement, was that termination of Father's parental rights would be in the children's best interests. Ultimately, the trial court found by a preponderance of the evidence that it was in the children's best interests that Father's parental rights be terminated. The trial court's oral pronouncements were followed by a written judgment as to parental fitness and permanent termination. Father now appeals.

¶ 23                                    II. ANALYSIS

¶ 24 On appeal, Father argues the trial court erred in finding him unfit because the findings were not supported by clear and convincing evidence. He further argues the court erred in finding it to be in the children's best interests to terminate his parental rights because the findings were not supported by a preponderance of the evidence.

9

¶ 25    The State argues Father forfeited his claims that the trial court erred in finding him unfit and finding it to be in the children's best interests to terminate his parental rights on appeal because he failed to file a postadjudication motion and did not raise any of the issues in the trial court. However, a postadjudication motion is not required to preserve issues on appeal for proceedings under the Juvenile Court Act, but the principle of forfeiture applies when a party fails to raise an issue below. *In re M.W.*, 232 Ill. 2d 408, 430 (2009). Here, Father asserts the State failed to meet its burden of proof. His arguments regarding the findings of unfitness and best interest of the child are sufficiency of evidence arguments which fall under an exception to the forfeiture rule. See *People v. McDonald*, 2016 IL 118882, ¶ 45; see also *In re Gail F.*, 365 Ill. App. 3d 439, 445 (2006).

¶ 26    Proceedings for the termination of parental rights are governed by the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)). Once a petition for termination of parental rights is filed under the Juvenile Court Act, a two-step process is required for termination. *In re C.W.*, 199 Ill. 2d 198, 210 (2002). First, the State must establish that the parent is unfit, by clear and convincing evidence, under one of the grounds set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). Once the trial court makes a finding of unfitness, it must then consider if it is in the child's best interest to terminate the parent's parental rights. *In re C.W.*, 199 Ill. 2d at 210.

¶ 27                                    A. Fitness

¶ 28    On appeal, Father first argues that the trial court erred in finding him unfit. He claims the court's findings were not supported by clear and convincing evidence that he failed to: (1) maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare; (2) make

10

reasonable efforts to correct the conditions that were the basis for the removal of the children from him during any nine-month period following adjudication of neglect and/or abuse and/or dependency under the Juvenile Court Act; or (3) make reasonable progress toward the return of the children to him during any nine-month period following the adjudication of neglect and/or abuse and/or dependency under the Juvenile Court Act.

¶ 29    Every alleged ground of unfitness need not be proven before finding a parent unfit. *In re D.C.*, 209 Ill. 2d 287, 296 (2004). "A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *In re Gwynne P.* 215 Ill. 2d at 349. Clear and convincing evidence requires proof greater than a preponderance of the evidence but less than proof beyond a reasonable doubt. *In re D.T.*, 212 Ill. 2d 347, 362 (2004). "A trial court's finding of unfitness is afforded great deference because it has the best opportunity to view and evaluate the parties and their testimony; the trial court's finding will not be disturbed on appeal unless it is against the manifest weight of the evidence." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006) (citing *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002)). It must be shown that "the opposite conclusion is clearly evident or the determination is unreasonable, arbitrary, or not based on the evidence presented" in order for a finding to be against the manifest weight of the evidence. (Internal quotation marks omitted.) *In re I.W.*, 2018 IL App (4th) 170656, ¶ 35.

¶ 30    One statutory ground of unfitness is a "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2020). As a basis for unfitness under this section, the trial court may consider any one of the three individual elements, *i.e.,* interest *or* concern *or* responsibility. *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31. The interest, concern, and responsibility a parent shows must be objectively reasonable. *In re Tr. A.*, 2020 IL App (2d) 200225, ¶ 50. The trial court should take into account any circumstances

11

that make it difficult for a parent to visit, communicate with, or otherwise show interest in his child. *In re C.D.*, 2020 IL App (3d) 190176, ¶ 33. The trial court may consider the completion of service plans as evidence of whether a parent has shown a reasonable degree of interest, concern, or responsibility. *In re Daphnie E.*, 368 Ill. App. 3d at 1065.

¶ 31    In this case, the evidence revealed Father showed very little interest, concern, or responsibility toward T.D., T.B., and Ti.D., let alone a reasonable degree. He wholly failed to complete his services. He did not keep the agency informed of any changes in his whereabouts. He did not engage in any domestic violence services, submit to drug screens, or engage in mental health services. While Father completed inpatient substance abuse services, he did not engage in follow-up services. Moreover, although he completed a parenting class while incarcerated, he did not do so until well into the life of this case. As of the April 15, 2021, permanency review reports, Father failed to visit with the children despite the agency's attempts to schedule visitation with him.

¶ 32    While Father argues that he was unable to complete services due to his incarcerations, we find that argument unavailing. Father had significant periods of time, some 18 months, when he was not incarcerated during which he chose not to work toward the completion of his services or visit his children.

¶ 33    An opposite conclusion to the trial court's decision is not clearly evident. Nor is the decision unreasonable, arbitrary, or not based on the evidence presented for the trial court to find Father unfit for failing to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of T.D., T.B., and Ti.D. Thus, we find the trial court's determination finding Father unfit under this ground was not against the manifest weight of the evidence. Since only one ground

of unfitness needs to be proven to find a parent unfit, we need not address the trial court's other findings of unfitness. *In re D.C.*, 209 Ill. 2d at 296.

¶ 34                                     B. Best Interests

¶ 35    Father next contends that the trial court erred when it found by a preponderance of the evidence that it was in the children's best interests to terminate his parental rights. Once a trial court makes a finding of unfitness, "the focus shifts to the child. The issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). "Accordingly, at a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* "We will not disturb a court's finding that termination is in the children's best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005) (citing *In re M.F.*, 326 Ill. App. 3d 1110, 1115-16 (2002)). It must be shown that "the opposite conclusion is clearly evident or the determination is unreasonable, arbitrary, or not based on the evidence presented" in order for a finding to be against the manifest weight of the evidence. (Internal quotation marks omitted.) *In re I.W.*, 2018 IL App (4th) 170656, ¶ 35. "[I]t is not in a child's best interest for his or her status to remain in limbo for extended periods of time." *In re S.L.*, 2014 IL 115424, ¶ 23.

¶ 36    The trial court shall consider the following statutory factors in the light of the child's age and developmental needs when determining best interest: (1) the physical safety and welfare of the child; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence; (8) the uniqueness of every family and child; (9) the risks attendant to entering and being in substitute care; and (10) the preferences of the persons available

13

to care for the child. 705 ILCS 405/1-3(4.05) (West 2020). The trial court is not required to refer explicitly to each of these factors in its determination of best interests. *In re Tr. A.*, 2020 IL App (2d) 200225, ¶ 58. No single factor is dispositive although all these factors must be considered. *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 31.

¶ 37    In the case now before us, a plethora of evidence was presented from which the court could find, by a preponderance of the evidence, that the best interest of Ti.D. would be served by terminating Father's parental rights. The child lived with the same foster parent for the majority of his life and was bonded to her. He knew no other home. He was integrated into daycare and extended family. The foster family was committed to providing permanency for Ti.D. through adoption. In short, the evidence supported a finding that the foster parent would provide a stable, safe, and loving home environment for Ti.D. Accordingly, we find that the trial court's determination that it was in Ti.D.'s best interest to terminate Father's parental rights was not against the manifest weight of the evidence.

¶ 38    We now turn to the other two children, T.D. and T.B. In its oral pronouncement, the trial court stated that it very carefully weighed the best interest factors and found permanency to be the most important factor. Although T.D. and T.B. were not currently in a long-term permanent placement, the children were placed together, and the foster family was meeting the children's basic needs. The children had been in the placement before and were familiar with the foster family. The children had friends at school and in the community. Moreover, the agency was pursuing a long-term placement with family members in Ohio although the process had to be put on hold until the trial court changed the goal to adoption. While the trial court's decision regarding T.D. and T.B. was not as clear cut as with Ti.D., we cannot say the opposite conclusion to the trial court's decision is clearly evident. Nor can we say it is unreasonable, arbitrary, or not based on the

14

evidence presented for the trial court to determine it to be in the best interests of T.D. and T.B. to terminate Father's parental rights. Thus, we find the trial court's determination that it was in T.D.'s and T.B.'s best interests to terminate Father's parental rights was not against the manifest weight of the evidence.

¶ 39                                III. CONCLUSION

¶ 40    For the foregoing reasons, the trial court's decision to terminate Father's parental rights is affirmed.


¶ 41    Affirmed.